docket. So we will appreciate everyone adhering to our time limits. When our yellow light comes on, you have two minutes left. And by the way, you don't have to use all of your time necessarily. But anyway, when the red light comes on, we ask you to conclude as quickly as possible unless you're answering the court's question. Also, we appreciate record citations when those are appropriate. And with that, we'll call the first case of the morning, No. 18-20827, State Oil USA v. Department of the Interior. Mr. Post. May it please the court. In 1982, Congress enacted the Federal Oil and Gas Royalty Management Act and constrained the Department of Interior's enforcement discretion with a four-tier penalty hierarchy. For 30 years, Interior respected the limits of that hierarchy until this case. This is a test case to resolve whether Interior can expand its powers under Section 1719D of the statute in cases involving a failure to correct royalty reports after a notification of an error has been given to a lessee. I'd like to focus on three principal areas in my time with the court this morning. The first is to accept responsibility for State Oil's reporting errors and orient those errors within the context of the penalty scheme. The second is to focus on the key canons of construction that control the case, particularly the canon of consistent usage, which I believe is the controlling principle here. And the third is to consider the future implications of Interior's position for future cases, because this appeal will not only decide a single penalty for a single set of facts. It will set precedent for future enforcement efforts under Section 1719D, and for that reason, the case is of great importance. I think that the American Petroleum Institute amicus brief nicely articulates the reason this issue is very important to the entire regulated industry. And so I urge the court to envision this case as a referendum on the statutory scheme, not simply the facts of a particular case. Do you think that's why Interior just imposed a $50 a day instead of $25,000 a day penalty? I do, Your Honor, because I think that this is an instance of the camel's nose under the aggressive would make this a more substantial target, and by imposing a modest penalty, a penalty that could have been imposed under Sections A and ultimately B, they hope to avoid searching scrutiny. Yes, Your Honor. Are there cases out there where they've imposed these staggering penalties? I don't know the state of the history of Interior's enforcement efforts with respect to their ability to speak to how frequently they assess the maximum penalty, but of course, the important consequence is that the threat of the penalty exists, and the threat itself is a significant hammer that can be used with leverage against the regulated industry in a way that Congress didn't contemplate in Sections A and B of this scheme. I'd like to begin my remarks this morning by acknowledging the facts of our case and offering something of a mea culpa, because I don't want there to be any mistake about this issue. Statoil was wrong for failing to correct its royalty reports when the errors were called to its attention. We acknowledge the importance of royalty reporting and acknowledge the importance of the obligation to correct errors. That correction wasn't made promptly here, and we are not proud of it. But that fact does not give the government carte blanche to impose any penalty it wishes to impose, acting at its own discretion like a king dispensing justice. At what point did Statoil pay the royalties it owed? Your Honor, the royalties were paid in May of 2012. The notice of penalty was ultimately issued in February of 2012, and the past two royalties were paid in May of 2012. There had been a conversation ongoing between Interior and the Statoil staff accountant over those royalty reports over the preceding year. And for reasons that the record doesn't disclose, the corrections were not made previously, and the royalties were ultimately paid with interest, but not until after the notice of penalty. Right. And when, if ever, were the corrections made? The corrections were made, I believe, Your Honor, at the same time, May 2012. Oh, math. For some reason I thought it was later. Okay. There may have been, I believe the record may suggest that of the 21 months at issue, there may have been one or two months that were still trailing to be corrected, but in substance, the corrections had been made by May of 2012. I have suggested to the Court that the facts of our case do not give Interior carte blanche, and I would submit that the regulatory scheme provides an appropriate mechanism to deal with this situation. Congress provided that a failure to correct after notice has been given is subject to an explicit penalty scheme under Sections A and B of Section 1719. That provision specifically provides that Interior shall issue a notice of noncompliance that gives the regulated entity 20 days of a grace period to correct upon penalty of 500 per day civil penalty if it's not corrected. And if it's not corrected by the 40th day from the notice of noncompliance, Interior can increase that penalty to $5,000. That scheme applied here. There's no question that that scheme applied here. Interior could have issued a notice of noncompliance at any time after the 30th day after its order to correct, and it could have put Statoil to the choice of correcting within 20 days or incurring penalties. There is no barrier to application of the scheme that Congress implemented, and we acknowledge that that scheme was applicable. The order to report itself cited Sections A and B, the regulation that implements Sections A and B, as the penalty scheme that would be implicated if there was a failure to correct. Interior simply determined in its unlimited discretion that it was going to go directly to a Section D knowing and willful penalty without any formal notice to Statoil or to anyone in the regulated industry that this set of facts would trigger a Section 17D penalty. And I think that that implicates the concerns of this Court's decision in the Moss case and the Supreme Court's decision in SmithKline-Beacham where the courts have recognized that when an agency discovers new enforcement powers after years of inaction, the court should be skeptical of its interpretation of those powers. This statute was enforced for 30 years without any effort to apply Section 1719D to facts like these. That is a stipulated fact. You can find it at page 85 of the record, and you can also find it at page 1802 of the record. And so I want to offer to the Court and to my colleagues here an invitation to address a question that has never been addressed in the course of this litigation. Why was Section 1719A and B inadequate to deal with these facts? Interior has never given any reason why the regulatory scheme that Congress dictated was insufficient to deal with Statoil's conduct. Why did Interior find it necessary to depart from its standard operating procedure? Let me ask you a question. If I understand this reporting scheme correctly, this is basically, the reports are basically like division orders, right? Oil and gas division orders. They tell you how much has been produced. I think that's generally accurate, Your Honor. And then they tell you what government's percentage royalty is. That's correct. I think that's generally accurate. Okay. Is there anything cumulative about such orders from month to month? My understanding, and I can certainly be corrected if I'm mistaken, but my understanding is that the orders address each month's production, and so I don't understand them to be cumulative. But if I'm mistaken about that, I'll correct you. Well, so if there is a mistake, each mistake is a one-time event without later consequences, unless, of course, there's some scheme going on to embezzle or something. Right? Yes. Okay. And under the penalty scheme, as Interior interprets it, for each day that those reports remain on file without being corrected, Interior reads that as a continuing violation subject to penalties each day. Let me turn in that context to the canons of construction that I think are applicable here. I don't want to focus particularly on the canon of consistent usage because the key aspects of this argument I think are undisputed. Everyone agrees that in every instance in which the word maintains is used elsewhere in FAGRAMA, it refers only to possession of a lessee's internal records, and the key provisions that I urge the Court to consider here are Section 1713 and Section 1724 of the statute. Those are the provisions that impose the substantive obligation to maintain records, and in those contexts, it's unambiguous that the word maintains refers only to maintenance of the lessee's internal records. I submit that that is controlling in this case. Yes, Your Honor. Their principal argument against that is that, of course, A, that maintain is a coat of many colors in its definition, and also that if maintain in this context only applies to the records in-house, then there's an arbitrary distinction between keeping the records false in-house and reporting the records falsely to the agency. Your Honor, let me speak to both of those objections. With respect to the coat of many colors argument, I think this Court has rejected that argument in the context of the word maintains in its Fethalios decision. In Fethalios, the government was here arguing the word maintains in the same statute meant two different things in two separate sections, and Judge Jolly said that argument is foreclosed by the candidate of consistent usage, and I submit that that's compatible with what the U.S. Supreme Court has repeatedly said, most importantly in the last couple of years, where it said that in all but the most unusual situations, a word must be given the same meaning in each section of a statute. So it's the burden of the government to overcome that strong presumption. Now, with respect to the argument that there would be some anomaly about not imposing penalties on this sort of conduct, I submit that that just misconceives the statutory scheme. There is a penalty that is provided in sections A and B for failure to correct after notice. Congress has determined what it considers to be the appropriate calibrated penalty for these facts. Interior simply doesn't want to pursue it. If a regulated entity knowingly files false reports at the outset, there's no question under 1719d that is a subject for a knowing and willful penalty, but that's not the case we have here. We have a case in which the regulated entity made an innocent mistake, was notified of the error, failed to correct it. That is precisely the scenario that sections A and B speak to. And so not only the consistent usage canon, but the canon of specificity dictate, giving effect to the scheme that Congress implemented and not allowing Interior the discretion to supplant that with its own policy judgment. And the reason I think it's especially important not to give Interior that discretion is because of the implications of this interpretation for future cases. By leapfrogging straight to the section D penalty, Interior has discarded the congressional scheme, and whatever you think of the righteousness of a penalty such as this one on these facts, the consequences going forward are troubling. There is no limiting principle to Interior's reading of section 1719d, and if you read nothing else in the record, I urge you to read pages 1768 to 83 of the record. That is the passage in the hearing before the district court where the district court recognized this problem. The court noted that the government's interpretation posed slippery slope issues because it lacked any clear rule about how to differentiate conduct that's subject to A and B from conduct that Interior now says is subject to D, and it lacks any clear rule about when a penalty would occur. Well, I mean, in a way you're arguing that in a vacuum because D does say knowingly or willfully, and that's by the constraints of what your client has acceded to. That's off the table. But, Your Honor, my point is about a matter of statutory interpretation of judging whether this reading of the word maintains is correct. And so the point is not about knowing conduct with respect to saddle oil in this instance. The point is about the ability of Interior to leverage its rule in the future by sending a notice, not a formal notice of noncompliance as the statute contemplates, but simply in order to correct, and then taking a position 30 days later, failing to correct it means that that regulated party was knowingly in violation, triggering instantly penalties up to $25,000 a day without the 20-day cure period. Why didn't you just fix it? Your Honor, the record doesn't reveal. I have to acknowledge that the record does not tell us. The record doesn't have it in there, but it's a pretty fundamental question. So we all now have ourselves in the Fifth Circuit because you didn't fix it, and you could have fixed it. I understand, Your Honor. We've got a big case here. Well, let me answer that question as faithfully as I can. First of all, what the record reveals is the notice originally was sent to an individual who had left the company. When Interior followed up with saddle oil to determine why the original order to correct had not been complied with, the record reveals the individual who received it had left the company. There was a staff accountant who received the inquiry. That staff accountant engaged in discussion with Interior, trying to get clarification, trying to determine the accuracy of the records and make a resolution. It didn't happen as promptly as it should have happened, and I acknowledge it. But the suggestion that there was recalcitrance or defiance is not supported at all by this record. It was, candidly, sloppiness. But you have to think about not this sole case, but the implications for the future. An Interior's position has no limiting principle and threatens a significant consequence going forward. Thank you. All right, sir. We'll hear from Ms. Chilakamari. Thank you, Your Honor, and may it please the Court. Good morning. I'd like to pick off where saddle oil left in terms of this being important for future cases and the implication of the Department of Interior's interpretation. The interpretation that saddle oil has advanced would cause a significant loophole and would cause problems in the future. Let me go ahead. Congress enacted the FOGRMA because it was determined that there was too much reliance on the industry being on the honor system, and so Congress was making an effort to put the burden on the industry. And I think maybe a hypothetical would explain why saddle oil's construction of the term maintain is problematic, not just in this case but in future cases. Under their construction, as I understand it, what it would mean is that saddle oil, if it inadvertently submits false reports but then a few days later knows that the information that the government is using in the database is false, it doesn't have any incentive to do anything about it until, they argue, the government tells them that the information is inaccurate. So a company can sit on its hands, not do anything at all, and unless the government figures it out on its own, which it happened to do in this particular case, there's no incentive because under their construction, no penalty can run until the government sends them a notice under 1719A. Am I not correct that the whole point of these reports is to assure that the government is getting paid the royalties that it's owed? That is correct, although I would say that the database and this infograma is used also by BIA and BLM in administering these leases, and I think the data is also used for the government in terms of energy development and making future trend development, but primarily it's used for making sure that the royalties are paid and collected. And I think to your Honor's question about the money got paid and there was interest, but that's not the only purpose of the infograma. These royalties, the extra royalties that were owed in the amount of $300,000, those were owed in 2006 and 2007. Now Statoil eventually paid those, but the way that the system works is that the government makes disbursements on a monthly basis to sometimes if it's in a state. Again, as they say, knowingly and willfully is off the table here, but at the same time you're posing a hypothetical that would fall within knowingly or willfully, and it would also be covered by the term submit if they submit a false, inaccurate, or misleading report. That's covered by 1719D, is it not? I think the hypothetical that I'm posing, Your Honor, is that like Statoil, presumably if they inadvertently submit the false information, but perhaps their own internal audits or an employee later realizes that they made an error, at that point they didn't initially knowingly or willfully submit the false data, but a week later they realize, oh wow, we've really underreported or there's a discrepancy here. Under their construction, there is no incentive for the company to tell the government anything about it because no penalties would run. The government would have to discover this on its own, and what Congress intended here, what it even said in the legislative history, is that we don't want the government to have to rely on auditing internal files. What do you say to the argument that the imposition of the D1 scale of penalty here is based, can also be applied in situations where you'd otherwise have A or B, which is to say the government notices a discrepancy or the government is in contact with the company and notices a discrepancy, which puts the company on notice and therefore automatically the next step can be 1719D, but a company doesn't know whether the government is going to come down with that hammer. I think in this case, as Your Honor noted, this might have been a harder case if they didn't stipulate to the knowing or willful element here, but Congress intended for culpability to guide the discretion that's employed, and I think to answer your question, the government would have a burden to prove that the information was knowingly or willfully maintained, and there's a regulation here that's also at play. I think they took that off the table so that we don't have the question of knowingly or willfully before us, but we do have the overall operation of the statute, and of course, mind you, the threat of criminal prosecution. And I do think that it's a— Don't you think somebody like Justice Gorsuch would get a little concerned if this, to me, a mere problem of recordkeeping since the money is all paid up is treated as a potential criminal violation? Well, I think that Congress, recordkeeping was the heart of what FAGRMA was about, and, of course, there are burdens the government would have to— Congress was worried about money, and we are—I mean, the same as Congress isn't going to put us in jail when we pay the right amount of taxes but we may have an error in our tax return that we don't correct for seven years. I think I understand Your Honor's question, and I do think, of course, this wasn't a criminal case. If it were, the government would have a higher— I was going to say, but that's a possibility under D-1, as you very well know. Yes, that is correct. So what's the point of the tiered penalty—explain to me how the tiered penalty system works if essentially you want to potentially impose a level of criminal penalty for something that is alternatively an A or B violation. Right, I understand. I think, well, two points. First of all, the criminal—if the criminal had been employed, there would be a higher burden of proof beyond a reasonable doubt and so forth. But in terms of the tiered structure, I think it is important to look at the text. And the text of these penalty tiers, they're not exclusive and they are not sequential. It does not—Congress did not require that the agency go through each step because 1719A is quite broad. It actually doesn't specifically by its terms cover false information. What it covers is any violation of the statute, any violation of a lease term. That's quite broad. And to just give you an example of how it would work, if a company fails to provide a report at all, right, that wouldn't be a 1719D violation because you're not talking about false information or maintaining false information. It just didn't provide its report. That would be governed under A. But that's arguably an even worse violation because then the government doesn't get any money at all. Well, the government would know if there's no report, but if the government is getting false reports or if the government has inaccurate information, it's more difficult for the government to know that because it's not the keeper of—it doesn't have—the information didn't initiate with the government. But I think my point is that 1719A is quite broad. It covers a broad array of conduct. It could even, for example, be something like a lessee violating a lease term, failing to plug up a well before it abandons that. Again, that's a very serious matter because if you don't plug the well properly, you've got hydrocarbons leaking into the deep sea. That's right, Your Honor. But I think the point is that Congress— You're saying these are not clearly tiered penalties. Even though the series of sanctions would lead the reasonable person, layman perhaps, to believe that they are. It's tiered in that you're right, that the sanctions go up, but it's not exclusive. There is some overlap, and it's also not sequential. 1719C and D are talking about very specific type of conduct where it's knowing or willful. This might have been a harder case if the government— if we had gone through discovery, but stat oil left all that on the table and I think made this somewhat an easier case because we're just looking at the pure definition of maintain. But in an ordinary case, the government would have to go through the steps of showing that the conduct was knowing or willful at the time. Well, I have to say here that the fact that that is off the table, it seems to me, doesn't make— we don't draw an assumption either way about knowing or willful in this case. I think that they've conceded it, Your Honor. They conceded it. They conceded it. I know they conceded it in the sense— Right. Okay, I'll take your point. Could you—I have a concern about the word maintain. Yes. And that is that it seems to me that when you're talking about maintain, well, you can answer his question about consistent usage, but also it seems to me when you're talking about maintain, you're talking about something that is an active and not a passive action. So, in other words, I think one of Judge Atlas' examples was a student maintaining good grades. Well, the student doesn't just sit there to maintain good grades. The student has to be actively engaged in studying and performing. And likewise, if you maintain a library, you have to dust the books periodically so they don't, you know, get roaches on them. So how do you explain maintain in terms of just filing a report and not doing anything? The plain meaning of the word maintain includes keeping up and also affirming. And if you think of the word in terms of, you know, one can maintain an argument or maintain their innocence, that the regulation here that actually puts the duty and specifies that they have a duty to maintain, that's 30 CFR 1210.30. That was in existence at the time of this conduct. That regulation clearly puts that duty to not only requires electronic submission of these reports, but it also says that if you discover an error in a report that you've submitted, you have to keep that up. You have to go in and amend and provide accurate information. I would submit that that regulation creates an onus on the reporter and the payer to not only submit, but to maintain the information on the database. So that's an ongoing obligation that the people who are engaging in this and who are getting leases, they have that ongoing obligation. Who has accesses that can use that database? The reporters and payers, so the operators and companies like the stat or the lessees, they have access and they must use the database. Electronic reporting is required by the regulations. And they essentially, there's sort of training videos even online that explain this. They essentially log in, they provide line-by-line information in terms of the volume of information that Judge Jones was referring to, and then they can go back in and have access. And that's actually an important question about having access to change the information. I think the word maintain, while they would like to argue that it only means to holding and possess, the important, I think, element of that is that you have the control, the ability to control. You can't have the obligation or burden to maintain something if you don't have the ability to access and control, but here they did. And not only did they have the ability, they had the duty to do so under the regulations that specifically apply to these reports. If I may answer the question about the other usages of the word maintain in FAGRMA, stat oil refers to Section 1711 and 1713. I think that those sections don't really speak to what the duty to maintain is. They simply say that 1711 talks about a transporter having the obligation to maintain records when they're transporting oil, and Section 1713 simply says that the secretary may issue regulations to require people to maintain certain items, but it doesn't talk about what maintain means. Well, neither does this provision. Correct, Your Honor, but I think in terms of, you know, looking to the statute and finding other usages of the word maintain in terms of the canon of consistent usage, I would say look at Section 1701 and 1717. These are the sections that the district court pointed to. Section 1701 also uses the word maintain, and it requires that the secretary maintain a royalty system. Section 1717 requires that the secretary maintain a training program. So maintain, I don't think the canon of consistent usage gets them very far because maintain is a code of many colors, and it's been used in ways that kind of encompass all of these meanings in FAGRMA itself. Well, it sounds to me as if all those other uses that you referred to are active, as I commented. I think in the, you know, as I mentioned before, the plain dictionary definitions include not only keeping something but to keep it up, but also to affirm. And in this context, when we're dealing with an electronic database where the government goes in and is checking that information, I think that the regulations would be my best answer to your question about the active nature of the duty. I think the regulation places that burden on the payer to essentially have an obligation to go back in. And whatever they're putting on the database is an affirmative representation of the data. The other concern I have is, as I also had the same concern in the Moss case was, the industry goes along with this offshore production under this law for 30 years with nothing happening. And then, curiously, after DOI invokes 1719D1 here, it passes a regulation that says, oh, by the way, I mean, that's exactly what happened in the Moss case. I would distinguish the Moss case, Your Honor, because there the agency had gone and actually told the industry. It had maintained. I mean, here DOI has maintained that 1791A and B are the appropriate standards, and now they're maintaining, suddenly, 1791D. I don't think there's any indication that the agency has ever taken a different interpretation here. There's no question of an interpretation. But they have maintained, have they not? They have kept up the illusion. I don't think that that's, we wouldn't push back on that, Your Honor. And I think it's different, again, from the Moss case where you actually had the agency going out and telling, in that case, you know, telling the contractors that you are not, you know, you're not going to be subject to these penalties here. There is no indication that the agency has ever taken a different approach. And, you know, if anything, you sort of. Excuse me, but, you know, you have a law that's not been applied for 30 years. People can, and there are other sections of the same law that capture the same kind, that you have to be at least overlapping with much. It's like a DUI law where you may, the police may have tiered penalties for DUI, but some people get away with repeated violations at a very low level, and then all of a sudden, for the first time, they put someone in jail. Well, I think that here, you know, what the agency tells me is that, and I think it's evident in this case, they normally try compliance. They normally try to reach out and get compliance before issuing penalties, and this was a very unusual situation. Normally when you ask, when you let the reporters know that they're propagating false information, they quickly come into compliance. Well, they did know in February of 2012 they got a notice that you're violating A or B. So initially in 2010 they got that notice, and at that point, and I think that Statoil is sort of conflating two different types of violations. The 2010 order dealt with the presumably inadvertent submission of information, and that would not be a violation of 1719D if it was inadvertent. But despite at least five attempts by the agency to obtain compliance, by the time 2012 rolled around, we're dealing with a different kind of violation at that point. It's a new violation because they're now knowingly or willfully maintaining the false information. So I think the reason why the 2010 order references 1719A was because in 2010, that's all the agency knew was going on. And so I think in terms of the 30-year period, I think the facts of this case make it such that it was an appropriate one to levy these kinds of penalties. I think, Judge Jones, you also asked a question of Statoil about the fact that this was a $50 penalty, and doesn't that somehow show that this is a lower penalty? The 2012 penalty notice states that it's using its standard assessment fee, and the regulations, 30 CFR 1241.70B, they talk about how the agency assesses penalties. My understanding is that the agency uses a penalty matrix, and it doesn't go to the max. So it was applying the $50 assessment, which is what the agency would apply for a 1719D violation. It's quite low, but on the lower end of 1719A, in other words, would have gotten it. Do we have any indication of the agency's practice? I mean, you say there's a matrix. Is that publicly available? That is not publicly available. So there's no notice to the people who are regulated as to what risks they're running. Well, I think in terms of the notice, of course, here they got the penalty that was much lower. The Supreme Court just overruled a series of criminal statutes that talked about violent conduct, and those were penalty enhancement provisions. They were not the base crime. They were enhancement provisions, and the Supreme Court said at least two times that these are unduly vague. I think in terms of the fair notice arguments here, Your Honor, I think a quick answer is that in this case they had actual notice. They had two forms of actual notice. First of all, the penalty that was issued was much lower, of course, in any of the tiers, and so there's no prejudice to them, but they had actual notice, number one, because in the pre-penalty teleconference in August of 2011, I believe, the agency told them, and they stipulated to this, they stipulated to all the facts in the administrative record, the agency told them in the pre-penalty teleconference, this is Record on Appeal, page 1099, that's a declaration from the agency, which says that they told Statoil that you will be subject to penalties for knowingly or willfully maintaining false information. Now, whatever Statoil might argue about the interpretation of maintain, they were certainly aware that the government viewed this conduct as a knowing or willful failure, and inexplicably they didn't resolve this until February 2012 rolled around. The other form of actual notice here is the regulation, 30 CFR 1210.30. Sorry, but your red light is on. Thank you, Your Honor. We would ask that you affirm. Mr. Post. Let me begin by answering the question that two members of the court have posed about the enforcement history from the interior. I'm advised that the most significant case is the Marathon Oil case, in which interior under 1719C, which is another knowing and willful provision, assessed the maximum statutory penalty in that case. At that time, it was a $10,000 penalty. Ultimately, a $10 million total penalty was upheld by the district court and affirmed by the Ninth Circuit. For what? Your Honor, that had to do with knowing and willful errors in reporting. I don't know the specific details, but I do know that that is the history that we know about in the reported cases from interior. Let me speak to some of the points that were made by the government. I want to address first the consistent usage point, since I've told you I think it's the controlling case. I think the government has no answer. They point to 1701 and 1717, but neither of those provisions has anything to do with the obligations owed by the lessee. Section 1713 is the statute that imposes the substantive obligation to maintain on the lessee. It's the predicate for the penalty provision, and 1713 maintain unequivocally refers to maintaining physical possession of the lessee's records, and the government does not deny it. Second point I want to make. Judge Jones made the point that it seems that maintain in most of its applications is an active concept, and I want to affirm that point. I think that's exactly right, and it's what differentiates a failure to correct errors in reports from the conduct that is the most severe for penalty purposes and criminally culpable in 1719d. That conduct is conduct that by its nature deceives the government. It is active conduct by a lessee that is in a condition that it deceives the government because the government otherwise does not have information. The maintaining in that context is maintaining false records that will defeat a government audit investigation. That is the conduct that's at issue in 1713 that's the predicate, and so it's an active effort to deceive, which is why it's criminal and which is why it's subject to the highest penalty, which is nothing like the conduct here where the government knew about the error, issued an order to correct it, and there was a failure to correct. That provision is specifically addressed in 1719a. Council says 1719a is broad, but 1719a is the specific provision that addresses the scenario of a failure to make a correction after notice from the government. It is the specifically applicable statute. Next, Your Honor, you alluded to the Moss decision and the concerns that this court rightly has when an agency discovers new enforcement powers after a long period of inaction. Council tries to distinguish Moss by saying in that case Interior had taken an explicitly contrary position, but Moss was founded on the Supreme Court's decision in Christopher, which was not based on that scenario. Here's what the Supreme Court said in Christopher. Whereas here an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute, and that is exactly what we have here. At the end of the argument, the government suggested that somehow the penalty that was assessed was different from the notice of the order to correct that was originally given, that the violation changed over time. This is the theory that the government has been proposing from the beginning, that somehow conduct that is originally only subject to A and B can morph into a knowing and willful violation under 1719d over time. But notice what the government never answered. I told you in the opening argument there are no limiting principles to this rule. The government provided no limiting principles. It has to be knowing and willful. No limiting principle? Your Honor, the lack of a... Are you telling me your client just never knew about this? No, I'm not denying that my client was notified in a telephone call. My client was never given the formal notice of noncompliance. Your client had excellent lawyers. They knew what the risk was. I mean, it's not rocket science. Well, Your Honor, if I may respectfully push back at that just a bit, the only thing the stipulated record establishes is that a staff accountant was advised of the possibility of a knowing and willful violation. There's no indication that anyone else at Statoil knew. But here's the point I want to make in response to your question. With all the good lawyers that Statoil has, that no one knew that there was this provision in the statute? Oh, no, I'm not suggesting that Statoil was ignorant of the statute. I don't have any ability to speak for the knowledge of the staff accountant who had this conversation, but I don't pretend that Statoil wasn't aware of the statute. Statoil knew of the history of enforcement for three decades of the statute, which had never been applied in this context. Your Honor, you had asked me about a limiting principle. I see my time has expired. I can explain what I mean by that, but if the court has heard enough, I know you've got a long morning, so I'll leave it to your discretion. I think we understand it from the briefs. Very good. Thank you, Your Honor. I appreciate the court's time. We appreciate it. Very well argued on both sides.